IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

Case No. 5:25-CV-00782-M-BM

| | |
|---|---|
| AWP, INC., et al., | |
|     Plaintiffs, | |
| v. | ORDER |
| JEFFREY FOOSE, et al., | |
|     Defendants. | |

This matter comes before the court on A WP, Inc. ("A WP") and Stay Alert Safety Services, LLC's ("Stay Alert") (collectively, "Plaintiffs") Motion for Preliminary Injunction [DE 6]. They move to enjoin their former employee, Jeffrey Foose, from violating non-compete and non-solicitation clauses in his employment contract.[1] Because Plaintiffs have not clearly demonstrated that Foose likely violated the terms of those provisions, the motion is denied.

## I.    Background

Unless otherwise noted, the following facts appear to be undisputed. Plaintiffs are corporations who provide municipalities, utility companies, and private contractors with traffic control equipment and control services. DE 7-1 at ¶ 3. Stay Alert is a wholly owned subsidiary of A WP, and together, they maintain offices throughout the United States and Canada and provide services to customers in both countries. DE 1 at ¶¶ 12–13; DE 13 at ¶¶ 12–13.

---

[1] Plaintiffs also brought claims against Foose and his current employer Traffic Plan for alleged violations of North Carolina tort law, but those claims are not relevant to the pending motion.

In 2017, Foose was hired by Stay Alert as Vice President of Operations. DE 14-2 at ¶ 5. On September 27, 2024, after AWP had purchased Stay Alert, Foose executed a "Confidentiality, Non-Competition, and Non-Solicitation Agreement" ("the Agreement") from his home in Alabama. DE 1 at ¶ 27; DE 13 at ¶ 27; *see also* DE 1-1. Plaintiffs assert that this contract was executed in consideration for Foose's promotion to Senior Director of Business Development. DE 7 at 3. Foose, by contrast, states that he was never promoted; instead, he characterizes the contract as being incidental to AWP's acquisition of Stay Alert. *See* DE 14 at 9–10. Either way, the Agreement included several restrictive covenants—three of which are relevant here. *See* DE 1-1 at ¶¶ 1(c)–(e). The "Non-Compete" cause reads:

> Employee covenants and agrees that during Employee's employment and for a period of twelve (12) months following the conclusions of Employee's employment for whatever reason, or following the date of cessation of the last violation of this Agreement, or from the date of entry by a court of competent jurisdiction of a final, unappealable judgment enforcing this covenant, whichever of the foregoing is the last to occur . . . Employee will not, as principal, or in conjunction with any other person, firm, partnership, corporation or other form of business organization or arrangement . . . directly or indirectly, be employed by, provide services to, in any way be connected, associated or have any interest of any kind in, or give advice or consultation to any Competitive Business within a 120-mile driving distance from Employee's regularly assigned place of duty or office.

*Id.* at ¶ 1(c). The "Non-Solicitation of Employees" clause reads:

> Employee covenants and agrees that, during the Restricted Period,[2] Employee shall not, without the prior written permission of AWP, directly or indirectly (i) solicit, employ or retain, or have or deliberately cause any other person or entity to solicit, employ or retain, any person who is employed or is providing services to AWP at the time of Employee's termination of employment or was or is providing such services within the twelve (12) month period before or after Employee's termination of employment or (ii) request, suggest or deliberately cause any

---

[2] The Restricted Period is defined by the Agreement as "a period of twelve (12) months following the conclusion of Employee's employment for whatever reason, or following the date of cessation of the last violation of this Agreement, or from the date of entry by a court of competent jurisdiction of a final, unappealable judgment enforcing this covenant, whichever of the foregoing is the last to occur[.]" DE 1-1 at ¶ 1(c).

2

employee of AWP to breach or threaten to breach terms of said employee's agreements with AWP or to terminate his or her employment with AWP.

*Id.* at ¶ 1(d). The "Non-Solicitation of Clients and Customers" clause similarly reads:

Employee covenants and agrees that, during the Restricted Period, Employee will not, as principal, or in conjunction with any other person, firm, partnership, corporation or other form of business organization or arrangement . . ., directly or indirectly: (i) solicit or accept any business, in competition with AWP, from any person or entity who was an existing or prospective customer or client of AWP at the time of, or at the time during the twelve (12) months preceding, Employee's termination of employment; or (ii) request, suggest or deliberately cause any of AWP's clients or customers to cancel, reduce, change the terms of or terminate any business relationship with AWP involving services or activities which were directly or indirectly the responsibility of Employee during Employee's employment.

*Id.* at ¶ 1(e). The Agreement additionally provides that it "shall be governed, construed, performed[,] and enforced in accordance with . . . the laws of the State of Ohio, without reference to principles of conflicts of laws." *Id.* at ¶ 2(b).

The scope of Foose's role at AWP is heavily disputed. AWP maintains that "Foose was responsible for growing and expanding AWP's heavy highway traffic control work in the southeast," and that by virtue of his position, he had access to confidential information, including details of AWP's revenue and margins, its operational capabilities, and its strategies for growth. DE 19 at 2–3. Foose describes his role in a very different light. He asserts that he "was not responsible for sales, customer solicitation, or generating revenue," and that, in fact, he "was specifically instructed not to pursue customers." DE 14 at 4. As a result, he states that he "was not provided access to AWP's customer relationship management system ("CRM"), bidding software, pricing databases, or other confidential operational systems." *Id.* The parties agree that

3

Foose voluntarily resigned from his employment with AWP in April or May of 2025.[3] DE 7 at 5; DE 14 at 5. Thereafter, he commenced employment with Traffic Plan. DE 7 at 6; DE 14 at 5.

In the ensuing months, fourteen of AWP's other employees resigned and began working for Traffic Plan. DE 7 at 9. The parties' briefing focuses on two: Adam Lohr and Benjamin Barefoot. Prior to his departure, Lohr was a Branch Operations Manager in Raleigh, North Carolina. DE 7 at 8; DE 14-6 at ¶ 4. In June 2025, Lohr informed AWP that he was considering leaving the company, and shortly thereafter, he attended a meeting concerning the same with James Babcock and Wade Lackey. DE 7 at 7; DE 14 at 6. The parties disagree on what was communicated at that meeting, but afterwards, AWP came to believe that Foose had directly contacted Lohr and encouraged him to accept employment with Traffic Plan. DE 7 at 7; DE 7-3 at ¶ 14. On July 29, 2025, Lohr informed AWP that he would resign. DE 7 at 9; DE 14-6 at ¶ 15. The following day, Barefoot, Stay Alert's Project Manager in Raleigh and Lohr's "second-in-command," also gave a resignation notice. DE 7 at 7; DE 14-7 at ¶ 9

In August 2025, after both men had left the company, AWP discovered emails showing that they had both been in communication with Traffic Plan prior to their resignation. DE 7-3 at ¶ 20. One email, titled "Employment Agreement Adam Lohr," was sent to Lohr on July 17, 2025, by Jessica Carriero, an employee of Traffic Plan. *See* DE 7-3 at 8. It had attached an offer of employment for the position of "Operations Manager—North Carolina." *Id.* at 8, 19. In a second chain of emails, all of which were sent on July 21, 2025, an employee from Traffic Plan sought

---

[3] Plaintiffs state that Foose resigned by email on April 25, 2025, shortly after receiving an annual bonus. DE 7 at 5; *see also* Latta Decl. DE 7-1 at ¶ 23. Foose states that he resigned on May 5, 2025, which was the last day of his employment. DE 14 at 5; *see also* Foose Decl. 14-2 at ¶ 29. Though the parties do not discuss this discrepancy, it may potentially be resolved if Foose gave notice of his resignation on April 25 but continued to work until May 5. Ultimately, none of this affects the pending motion. The court makes note only for clarity.

4

information about the price of "arrow boards." *Id.* at 24–26. Originally, he sent an email to Foose and Tony Collins, a General Manager at Traffic Plan. *Id.* at 26; *see also* DE 14-3. Foose directed the employee to inform Barefoot of the cost difference, and ultimately, Barefoot responded by opining on which type of arrow board Traffic Plan should purchase. DE 7-3 at 24–25. In Barefoot's reply, he copied Lohr using his Stay Alert email address. *Id.*

On December 2, 2025, Plaintiffs filed the instant three-count lawsuit for breach of contract and tortious interference. *See* DE 1. Shortly thereafter, they moved for a preliminary injunction pursuant to Federal Rule of Civil Procedure 65(a). *See* DE 6. Foose filed a response in opposition, *see* DE 14, to which Plaintiffs filed a reply. *See* DE 19. In this posture, the motion is ripe for review.

## II.    Legal Standards

A preliminary injunction "is an extraordinary remedy" that is "never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). To obtain a preliminary injunction, a plaintiff must establish that (1) "he is likely to succeed on the merits," (2) "he is likely to suffer irreparable harm in the absence of preliminary relief," (3) "the balance of equities tip in his favor," and (4) "an injunction is in the public interest." *Id.* at 20. "[E]ach of these four factors must be satisfied to obtain preliminary injunctive relief," *Henderson ex rel. NLRB v. Bluefield Hosp. Co., LLC*, 902 F.3d 432, 439 (4th Cir. 2018), and "a district court is entitled to deny preliminary injunctive relief on the failure of any single *Winter* factor, without fully evaluating the remaining factors." *Vitkus v. Blinken*, 79 F.4th 352, 361 (4th Cir. 2023).

## III.    Discussion

Plaintiffs seek a preliminary injunction against Foose in relation to their breach of contract claim. In that claim, they allege that Foose has violated the terms of the Agreement by (1)

5

recruiting Plaintiffs' employees to work for Traffic Plan; (2) soliciting Plaintiffs' customers and causing them to terminate their relationship with Plaintiffs; and (3) competing with Plaintiffs within 120-miles "restricted geographic territory."[4] DE 1 at ¶ 54. They seek an injunction enjoining Foose from continuing to engage in those activities. DE 7 at 1, 21. They also seek a declaration restarting the one-year Restricted Period from the date on which the requested order is issued. *Id.* at 22–33.

As a threshold matter, the parties disagree on which state's substantive law should govern this dispute and, the answer to that question notwithstanding, whether the Agreement is even enforceable. Plaintiffs argue that the Agreement should be governed by Ohio law, in accordance with the choice of law provisions in the contract. DE 7 at 11. They argue that the restrictive covenants contained within the Agreement are "reasonably necessary to protect [their] legitimate business interests" and that the "temporal and geographic restrictions" are reasonably tailored to the case at hand. *Id.* at 15–16. Defendants, by contrast, argue that Alabama law should control because "Ohio has no substantial relationship to the contract at issue[,]" while Alabama has a

---

[4] Notably, Plaintiffs have taken inconsistent positions on whether Foose's employment with Traffic Plan necessarily violates the non-compete clause. *Compare* DE 1 at ¶ 54 ("Foose breached and continues to breach his obligations under the Agreement by [a]ccepting employment with Traffic Plan, a direct competitor of Plaintiffs, within the 120-mile restricted geographic territory[.]"), *with* DE 7 at 21 ("Foose is free to continue his employment with Traffic Plan as long as he refrains from unfair competition by soliciting the customers and employees of AWP and its subsidiaries, refrains from competing within 120 miles of his former seven-state territory, and refrains from using confidential information."). It is clear from the briefing that the alleged soliciting is at the root of Plaintiffs' concern and that, as a result, they seek an order reimposing the terms of the agreement for another year. Aside from that, it is unclear precisely what behavior Plaintiffs want the court to enjoin in relation to the non-compete clause. Ultimately, Plaintiffs carry the burden of demonstrating "both whether preliminary injunctive relief should be granted and what type of relief should be ordered." *See Pargas, Inc. v. Empire Gas Corp.*, 423 F. Supp. 199, 246 (D. Md. 1976); *see also Winter*, 555 U.S. at 20. Accordingly, this order (in accordance with the parties' briefing) focuses primarily on the evidence that Foose engaged in unlawful soliciting.

"fundamental public policy" that its more stringent regulations on trade restrictions should be enforced. DE 14 at 16–17; *see also* Ala. Code § 8-1-197 ("Therefore, this article shall govern and shall be applied instead of any foreign laws that might otherwise be applicable in those instances when the application of those foreign laws would violate a fundamental public policy expressed in this article."). Defendants argue that under these regulations, the restrictive covenants are void and unenforceable because (1) Foose signed the Agreement prior to commencing his employment with AWP;[5] (2) a representative of AWP did not sign the same;[6] (3) Plaintiffs do not have a "valid protectable interest permitting enforcement" of the non-compete clause; (4) the non-compete clause imposes an "undue hardship" on Foose; and (5) Foose did not hold a "uniquely essential" role at AWP.[7] *Id.* at 21–26. Alternatively, Defendants argue that the Agreement is unenforceable under Ohio law. *Id.* at 27–30.

---

[5] Alabama law treats contracts restraining an individual "from exercising a lawful profession, trade, or business of any kind" as void unless they fit within one of six enumerated exceptions. *See* Ala. Code. § 8-1-190(a)--(b). The Alabama Supreme Court, in interpreting a similar but now-repealed version of that statute, held that "[t]he employee-employer exception to the voidness of noncompete agreements does not save a noncompete agreement unless the employee-employer relationship exists at the time the agreement is executed." *Pitney Bowes, Inc. v. Berney Off. Sol.*, 823 So.2d 659, 662 (Ala. 2001). Alabama courts have not explicitly held that that rule continues to govern today, but the logic of *Pitney Bowes* appears to apply with the same force to the now-governing statute. Under the repealed statute, individuals who were "employed as an agent, servant[,] or employee" were permitted to agree with their "employer" that they would not compete with said employer or otherwise solicit is customers and employees. *See* Ala. Code. § 8-1-1 (repealed 2015). The Alabama Supreme Court interpreted that statute as requiring a current employee-employer relationship "at the time the agreement is executed." *Pitney Bowes*, 823 So.2d at 662. The new statute similarly permits "[a]n agent, servant or employee of a commercial entity" to "agree with such entity" that they will refrain from competing or soliciting customers, subject to reasonable geographic and time restrains. *See* Ala. Code. § 8-1-190(b)(4)–(5). Because the new statute also requires that a party to a contract presently be an "agent, servant, or employee," or the associated "entity," *Pitney Bowes*' logic likely carries over and continues to apply.

[6] Under Ala. Code § 8-1-192, contracts that restrict an individual restrictive covenants on trade must be "reduced to writing, signed by all parties, and supported by adequate consideration."

[7] Under Ala. Code. § 8-1-190(b)(1), contracts "between two or more persons or businesses or a person and a business limiting their ability to hire or employ the agent, servant, or employees

7

It is not necessary to answer these questions to determine whether a preliminary injunction is warranted. Regardless of whether Ohio or Alabama law is applied, and assuming for the sake of argument that the Agreement is valid and enforceable, Plaintiffs would have to prove that Foose likely violated the terms of the Agreement. *See Dupree v. PeoplesSouth Bank*, 308 So.3d 484, 490 (Ala. 2020) ("The elements of a breach-of-contract claim under Alabama law are (1) a valid contract binding the parties; (2) the plaintiffs' performance under the contract; (3) the defendant's nonperformance; and (4) resulting damages.") (citations and quotations omitted); *Lucarell v. Nationwide Mut. Ins. Co.*, 97 N.E.3d 458, 469 (Ohio 2018) ("A cause of action for breach of contract requires the claimant to establish the existence of a contract, the failure without legal excuse of the other party for performance when performance is due, and damages or loss resulting from the breach."). From the evidence presented thus far, Plaintiffs have not met that burden.

Plaintiffs argue that Foose violated the terms of the Agreement in three ways: first, by soliciting Lohr to accept employment with Traffic Plan; second, by soliciting an AWP client, C.R. Jackson, Inc.; and third, by "overseeing Traffic Plan's efforts to establish business operations in North Carolina." DE 7 at 18. The court addresses allegation in turn.

A.     Alleged Solicitation of Employees

First, Plaintiffs argue that Foose violated the Non-Solicitation of Employees clause by recruiting Lohr to work for Traffic Plan. *Id.* In support of this contention, they submit two declarations from Babcock. *See* DE 7-3, 19-2. Babcock states that on June 26, 2025, he and Lackey had an in-person meeting with Lohr. DE 7-3 at ¶ 14. At that meeting, Lohr reportedly "informed [them] that Foose was soliciting [him] to work for Traffic Plan and that Lohr was

---

of a party to the contract" if the "agent, servant, or employee holds a position uniquely essential to the management, organization, or service of the business."

considering resigning from Stay Alert to accept" that offer. *Id.* Regarding Foose's involvement, Babcock states that Lohr said he had attended two virtual conferences with Foose and Collins regarding an employment offer. DE 19-2 at ¶ 10. Babcock also states that by the end of the meeting, Lohr decided, after brief consolation with his wife, that he would remain employed at Stay Alert" and that, the following day, "Stay Alert increased his compensation."[8] DE 7-3 at ¶ 15; DE 19-2 at ¶ 11.

Lohr denies all of this. In his telling, the meeting in question was "confrontational," "uncomfortable," and "hostile," and he felt as if Babcock and Lackey were "attempt[ing] to pressure [him] into staying" with Stay Alert. DE 14-6 at ¶¶ 11, 13. More importantly, he states that he explained to Babcock that "*Tony Collins* . . . had approached [him] regarding an employment opportunity." *Id.* at ¶ 9 (emphasis added). Lohr denies that Foose ever attempted to persuade him to work for Traffic Plan. *Id.* at ¶ 10 ("I did not tell Mr. Babcock or Mr. Lackey that Jeffrey Foose ("Mr. Foose") solicited me. That is because Mr. Foose did not solicit me. Mr. Collins did."). Moreover, he states that at the conclusion of the meeting, he had not yet made up his mind about staying with the company and told Babcock and Lackey that he "needed time to think[.]" *Id.* at ¶ 13.

Lohr's description is corroborated by declarations submitted by Foose and Collins. Foose states that he "never solicited Adam Lohr . . . Benjamin Barefoot . . . or any other AWP or Stay Alert employee to leave their employment or join Traffic Plan." DE 14-2 at ¶ 44. Rather, he testifies that he "only met Mr. Lohr one time, approximately three . . . to four . . . years ago" and

---

[8] Babcock's statement concerning compensation is corroborated by an email and a screenshot of four text messages. In the email, which was sent the day after the meeting, Babcock informs Lohr that "[e]ffective the next pay period," his salary would "be adjusted to $110,000 annually." DE 19-2 at 6. In the text messages, Babcock texts Lohr to inform him that he had sent the "confirmation email." *Id.* at 7.

that it was Collins who encouraged him to accept an employment offer from Traffic Plan. *Id.* at ¶¶ 45–46. Collins agrees. He states that Lohr is "a close, personal friend" whom he met approximately fifteen years ago when Lohr was in high school. DE 14-3 at ¶ 27. He further states that he "decided to approach Mr. Lohr" about joining Traffic Plan because of the pair's "longstanding professional relationship and [Collins'] direct personal knowledge of [Lohr's] abilities." *Id.* at ¶ 28. Regarding that decision, he specifies as follows:

> Mr. Lohr came to a gathering at my home and told me his boss at AWP had left to work for a competitor, although he informed AWP that he was leaving due to personal family issues. That same competitor offered Mr. Lohr a position in their Greensboro office. After Mr. Lohr eventually turned this position down, they hired Mr. Pratt. I then told Mr. Lohr that I was putting together a team and asked if he would consider working for Traffic Plan. Mr. Lohr initially declined my offer. Approximately two weeks later, he contacted me expressing renewed interest, accepted my offer of employment, and mentioned another potential candidate, Benjamin Barefoot ("Mr. Barefoot").

*Id.* at ¶¶ 29–31. Collins explicitly states that "Foose had nothing to do with" his decision to hire Lohr. *Id.* at ¶ 28.

These declarations present starkly contrasting versions of what was said at the June 26 meeting and the extent to which (if at all) Foose was involved in Lohr's decision to accept employment with Traffic Plan. The remaining evidence does not provide much clarity.

First, Plaintiffs rely on the chain of emails in which Foose, Collins, and Barefoot discussed the purchase of traffic control equipment. *See* DE 7 at 8. Plaintiffs assert that "this email revealed that . . . Foose was . . . spearheading Traffic Plan's efforts to enter the North Carolina market in direct competition with AWP and Stay Alert" and that it also revealed "that Foose convinced Stay Alert employees to assist in these efforts while the employees were still employed and being paid by Stay Alert." *Id.* It is unclear how the email chain supports these propositions. Foose's participation in those emails was minor. He and Collins were asked a question about two different types of traffic control equipment. *See* DE 7-3 at 26. Foose responded by directing the Traffic

10

Plan employee to contact Barefoot. *Id.* at 25. Plaintiffs emphasize the fact that Barefoot was still an employee of Stay Alert at the time the emails were sent. DE 7 at 8. That is, of course, true, and it supports the conclusion that Foose was at least *aware* that Barefoot was planning on resigning from Stay Alert. But nothing in the email chain suggests that Foose was the person who caused him to make that decision, much less that he was "spearheading" an effort to compete with Plaintiffs in North Carolina and steal their employees. *See id.*

Second, Plaintiffs submit declarations from Macio Dreher and Gabriel Richards, employees of Stay Alert who allege that on November 4, 2025, they were approached by a Traffic Plan employee named Lisbon Nimmons. *See* DE 7-7 at ¶¶ 2–3, 5. Dreher states that Nimmons approached them in "a white Ford pickup truck with 'Traffic Plan' emblazoned on the side" and told him that "'Jeff from Stay Alert' was running a new company named Traffic Plan and . . . would pay [Dreher] $22.00 an hour to come work for him at his new company." *Id.* at ¶¶ 4, 6. Both Dreher and Richards state that they were asked to send text messages to their manager explaining what had occurred. DE 19-3 at ¶ 13; DE 19-4 at ¶ 11. Plaintiffs attach screenshots of those text messages. *See* DE 19-3 at 4; DE 19-4 at 3. In the message sent by Dreher, he described a verbal confrontation between Richards and Nimmons and then advises that Nimmons told him that "Jeff from [S]tay [A]lert" would offer him $22 an hour to work at "that new company." DE 19-3 at 4. In the message sent by Richards, he does not mention this offer at all; he only describes the verbal confrontation. DE 19-4 at 3. Nimmons contends that this "is a lie." DE 14-5 at ¶ 17. He states that he never told anybody that "Foose was running Traffic Plan operations or that he was involved in soliciting business." *Id.* at ¶ 14. Regarding what was said during the alleged conversation, Nimmons states that Dreher asked him "whether Mr. Foose was 'back'" and that he responded that he "had not seen Mr. Foose in a long time and that Mr. Collins was the general

11

manager." *Id.* at ¶ 16. The declarations and screenshots are probative, but they are hearsay and are directly contradicted by both Nimmons (the alleged speaker) and Foose (the person the alleged speaker was referring to). In any event, they have no direct bearing on whether Foose solicited Lohr, which is the alleged violation underlying this portion of the motion. Thus, they do not meaningfully advance Plaintiffs' claim.

After considering all of this, the court finds that Plaintiffs have not shown that Foose likely violated the Non-Solicitation of Employees clause. The vast majority of Plaintiffs' evidence consists of declarations by Stay Alert employees describing what they heard from other people. Those other people have each submitted declarations unanimously denying that they made any of the alleged statements. The remaining evidence is circumstantial and, at best, only mildly probative. Of course, one-sided declarations and circumstantial evidence can, under the right circumstances, be sufficient to justify a preliminary injunction. *See, e.g., Carlson Env't Consultants, PC v. Slayton*, No. 3:17-cv-00149-FDW-DCK, 2017 WL 4225993, at *9–10 (W.D.N.C. Sep. 21, 2017) (issuing a preliminary injunction on a non-solicitation claim where the plaintiff had made a "clear showing" through "circumstantial evidence" that the defendant was soliciting the plaintiff's customers and employees). In this case, however, "the record is far from clear[,]" and factual disputes continue to exist that require "subsequent discovery in order to get to the bottom of what is going on." *See Torres Advanced Enter. Sols. LLC v. Mid-Atlantic Pros. Inc.*, No. PWG-12-3679, 2013 WL 531215, at *4 (D. Md. Feb. 8, 2013). In breach of contract cases, courts within the Fourth Circuit have consistently "declined to issue a preliminary injunction when there are significant factual disputes" in the record. *CytImmune Sci., Inc. v. Paciotti*, No. PWG-16-1010, 2016 WL 3218726, at *2 (D. Md. June 10, 2016) (quotations omitted); *Ramsey v. Bimbo Foods Bakeries Distrib., Inc.*, No. No. 5:14-CV-26-BR, 2014 WL 3408585, at *8 (E.D.N.C.

12

July 10, 2014) ("Because there is a factual dispute as to whether plaintiff breached the Distribution Agreement thereby entitling defendant to terminate it, plaintiff has not clearly shown that he will likely succeed on the merits of his breach of contract claim."); *Torres Advanced Enter. Sols. LLC*, 2013 WL 531215, at \*3 ("In the present case, the record highlights multiple unresolved factual disputes. As the resolution of these disputes is central to the determination of a breach of contract claim, Plaintiff is prevented from making a clear showing of a likelihood of success on the merits."); *Beacon Sales Acquisition, Inc. v. Cameron Ashley Building Prods., Inc.*, No. 1:25-cv-1820, 2025 WL 3721684, at \*9 (E.D. Va. Dec. 23, 2025) (declining to issue a preliminary injunction where the plaintiff's "speculative" claims largely relied on "beliefs that things did not pass the smell test" or "did not feel right") (quotations and brackets omitted); *Bartell v. Grifols Shared Servs. NA, Inc.* 618 F. Supp. 3d 275, 282 (M.D.N.C. 2022). The court follows suit here.

Accordingly, the court finds that Plaintiffs have not shown they are likely to succeed on the merits of their employee solicitation claim.

B.     Alleged Solicitation of Customers

Second, Plaintiffs argue that Foose violated the Non-Solicitation of Clients and Customers clause by attempting to solicit the business of a Stay Alert customer named C.R. Jackson, Inc. DE 7 at 10. In support of this claim, they submit a single declaration from Chuck Hayes, an employee of Stay Alert. *See* DE 7-8. He states that on November 18, 2025, at an industry sponsored golf event, he spoke with Thomas Oswald, a C.R. Jackson employee. *Id.* at ¶¶ 7–8. Hayes states that Oswald told him that Foose had contacted another C.R. Jackson employee, Al Bescher, about the possibility of "Traffic Plan providing services to C.R. Jackson." *Id.* at ¶ 11.

Again, Foose denies this. He states in his declaration that he "did not initiate contact, solicit work, or discuss competitive business" with any of Stay Alert's customers, to include C.R.

13

Jackson. DE 14-2 at ¶ 57. Instead, Collins takes credit, stating that he "was the person who reached out to C.R. Jackson about working with Traffic Plan" and that "Foose did not solicit any customers" because his "job responsibilities at Traffic Plan do not include soliciting customers." DE 14-3 at ¶¶ 49, 53. There is no other evidence in the record supporting Plaintiffs' claim concerning C.R. Jackson.

As above, the court finds that Plaintiffs have not shown that Foose likely solicited C.R. Jackson's business. The only evidence presented consists of hearsay-within-hearsay, and, once again, the alleged speaker denies that he said anything of the sort. Notably, neither Oswald nor Bescher (or any other C.R. Jackson employee) have submitted a declaration corroborating Hayes' account. On such a sparse and incomplete record, a preliminary injunction as to this claim is unwarranted.

### C.     Alleged Competition

Finally, Plaintiffs argue that Foose violated the Non-Compete clause by "overseeing Traffic Plan's efforts to establish business operations in North Carolina." *See* DE 7 at 18. As described previously, this is the most ambiguous of Plaintiffs' claims because they do not clearly identify the behavior they seek to enjoin. To the extent Plaintiffs rely on the alleged solicitation violations—which would constitute direct competition with AWP and Stay Alert—the claim fails for the reasons already stated. To the extent they rely on Foose's role at Traffic Plan more generally, they fail to demonstrate that he is (1) in a market-facing position or (2) otherwise violating the geographic restriction set forth in the Agreement.

As to the first point, Plaintiffs allege "upon information and belief" that Foose's responsibilities with Traffic Plan "are substantially similar to his responsibilities at AWP, including the development and management of customer relationships across the southeast." DE

14

7 at 6. Foose and Collins contest this description. They contend that Foose's role at Traffic Plan "is focused on identifying potential merger-and-acquisition opportunities and engaging in preliminary discussions with target acquisition companies before turning such matters over to Traffic Plan leadership." DE 14-2 at ¶ 39; DE 14-3 at ¶ 22. Foose states that as part of his role, he does not "solicit customers, submit bids, compete against AWP, or manage field operations at Traffic Plan," including those that occur in North Carolina. DE 14-2 at ¶¶ 40–41. Plaintiffs present no new evidence as to this claim, so the court finds that Plaintiffs have not shown that Foose is likely "overseeing Traffic Plan's efforts to establish business operations in North Carolina." *See* DE 7 at 18.

Even if Plaintiffs had made a stronger showing in this regard, they have not demonstrated that Foose is working within the geographic area outlined in the Agreement. Plaintiffs argue that under the non-compete clause, Foose may not compete within 120 miles of his "former territory"— which includes the states of Tennessee, Alabama, Georgia, North Carolina, South Carolina, and Florida. D 7 at 15; DE 19 at 5. But the Agreement does not say that. By signing the non-compete clause, Foose agreed not to compete with AWP "within a 120-mile driving distance from [his] *regularly assigned place of duty or office.*" DE 7-2 at ¶ 1(c) (emphasis added). At the time Foose worked for AWP, his assigned office was in Atlanta, Georgia. DE 14-2 at ¶ 33. Foose states that he does not work within a 120-mile radius of that office, and Plaintiffs do not argue to the contrary. Instead, they suggest that because Foose was responsible for managing business within the six-state territory, the entirety of each of those states should be considered his "regularly assigned place of duty." DE 19 at 5–6. That reading of the contract strains credulity. If AWP had intended to restrict Foose from competing within his former six-state territory, they could have said so. Instead, they referred to an "office" *or* a "regularly assigned place of duty," each of which denote

15

that the restriction applies to a static location. This interpretation has been adopted by at least one other court. In *AWP, Inc v. Safe Zone Servs., LLC*, No. 3:19-CV-00734-CRS, 2022 WL 989133 (W.D. Ky. Mar. 31, 2022), a district court found that AWP's noncompete provision was "facially unreasonable" and thus refused to enforce it. *Id.* at *8. In so doing, it considered the geographic limitation, which prevented the former employee in question from "working for any competitor 'within a 120-mile driving distance from Employer's regularly assigned place of duty or office.'" *Id.* The court found this restriction to be unreasonable in part because the "evidence in the record" indicated that the employee "would only work within sixty miles *of the Louisville office*," thus making the 120-mile range unduly restrictive. *Id.* (emphasis added). The court adopts the same interpretation here.

For these reasons, the court finds that Plaintiffs have not shown that Foose likely violated the non-compete clause.

## IV.     Conclusion

Plaintiffs have failed to show that Foose likely violated any portion of his employment contract and, thus, that they are entitled to the extraordinary remedy of preliminary relief. *See Winter*, 555 U.S. at 20. Accordingly, their Motion for Preliminary Injunction [DE 6] is DENIED.

SO ORDERED this _____29th_____ day of June, 2026.

_____
RICHARD E. MYERS II
CHIEF UNITED STATES DISTRICT JUDGE

16